645 So.2d 1345 (1994)
Charles E. THOMAS
v.
STATE of Mississippi.
No. 91-KA-0289.
Supreme Court of Mississippi.
December 1, 1994.
*1346 William M. Frisbie, Kiln, for appellant.
Michael C. Moore, Atty. Gen., John R. Henry, Jr., Sp. Asst. Atty. Gen., Jackson, for appellee.
Before HAWKINS, C.J., and McRAE and JAMES L. ROBERTS, Jr., JJ.
McRAE, Justice, for the Court:
This appeal arises from the March 2, 1991, judgment of the Sunflower County Circuit Court, wherein Charles E. Thomas was convicted of one count of burglary and two counts of rape. Thomas was sentenced as a habitual offender to fifteen (15) years on the burglary count and twenty (20) years on each count of rape, in custody of the Mississippi Department of Corrections, with all sentences to run concurrently, with no possibility of parole. On appeal, Thomas raises the following:
I. The trial court erred when it overruled Thomas' pretrial suppression motion.
II. Thomas was denied due process of the law as guaranteed by the Constitution of the United States and the Constitution of the State of Mississippi by a one day delay in bringing him before a magistrate for his initial appearance.
III. The trial court erred in refusing a jury instruction dealing with the identification of Thomas.
Finding no error in the trial below, we affirm the judgment of the lower court.

FACTS
On the night of June 12, 1990, sixty-six-year-old Mary Pearson awoke from sleep to find a naked man on top of her. He proceeded to rape her. No lights were on in her room, and, as a result, she was not able to identify her assailant. She did, however, testify that he was a young, well-built black man with short, curly hair. Pearson testified that after the young man raped her, he went into her bathroom and brought her a wet cloth to wash herself. He then raped her again. Pearson's assailant left the premises after threatening to kill her if she told anyone he had been there. Once he left, she ran to her next door neighbor's house and called the police.
City of Drew Police Chief Burner Smith was at home on the early morning of June 13, 1990, when he overheard the radio dispatcher send a patrolman to the scene of a rape. Since Chief Smith lived only a few blocks away from Charles Thomas, a suspect in several prior prowler calls and an earlier attempted rape, he drove toward Thomas' house and saw Thomas standing on a street corner near his house. As he drove slowly past Thomas' house, he saw distinctive footprints in the yard, similar to prints found at the scene of the aforementioned attempted rape, which had occurred two weeks previously. Chief Smith testified that, after the attempted rape, Thomas was identified by an individual as the person fleeing the attempted rape scene with police officers in pursuit.
On the night in question, after seeing Thomas on the street corner, Chief Smith drove to the police station, took a deputy *1347 sheriff with him and returned to Thomas' house. Chief Smith asked Thomas to accompany him to the police station, and Thomas voluntarily went. At the station, Thomas would not answer any questions or make any statements. After placing Thomas in detention, Chief Smith took Thomas' shoes to the crime scene. He interviewed Ms. Pearson and obtained a description of her assailant. Ms. Pearson was taken to the hospital where tests were administered. Samples received from these tests were sent to the Mississippi Crime Lab and the sperm taken from the victim's vagina was sent to the FBI Laboratory for DNA testing.
In the meantime, footprints like those left at the scene of the earlier attempted rape and at the scenes of several prowler complaints had been found in oil spots in the victim's carport by Officer Albert Robinson. Other footprints, left by the same type of shoe, were found in loose dirt near Ms. Pearson's house. Officer Robinson called for the canine unit from Parchman to assist. One of the bloodhounds tracked the scent from the footprints found at the crime scene to the defendant's house. In addition, the footprints matched the tread of the shoe worn by the defendant.
Thomas was taken to the hospital where blood and hair samples were taken. These samples were tested in the Mississippi Crime Lab and were sent to the FBI laboratory for DNA testing. At trial, an FBI special agent testified that the DNA test results showed Thomas to be the person whose sperm was found in the victim's vagina, and that the chance the sample was from another person was only one in two million.
Thomas was arrested without a warrant in the early morning of June 13, 1990, and his initial appearance was held in Justice Court in Sunflower County, Mississippi, the next day, June 14, 1990. On November 20, 1990, an indictment was returned charging Thomas with two counts of rape and one count of burglary of an occupied dwelling. A motion to suppress was filed on February 18, 1991, requesting the exclusion of a DNA analysis and any evidence regarding Thomas' shoe prints allegedly found at the scene of the crime. The said motion was heard and overruled by the circuit court on February 19, 1991. At trial, Thomas was convicted on all three counts, and because Thomas had previously been convicted of two separate felonies arising from unrelated incidents, the trial court sentenced him as an habitual offender.

LAW

I. DID THE TRIAL COURT ERRED WHEN IT OVERRULED THOMAS' PRETRIAL SUPPRESSION MOTION?
Thomas was functionally arrested when Chief Smith escorted him to the police station and later placed him in a detention cell. "A person is under arrest when by means of physical force or a show of authority his or her freedom of movement is effectively restricted. A person is under arrest when he is in custody and not free to leave." Nicholson v. State, 523 So.2d 68 (Miss. 1988) (Robertson, J. concurring). See Floyd v. State, 500 So.2d 989, 992 (Miss. 1986), cert. denied, 484 U.S. 816, 108 S.Ct. 68, 98 L.Ed.2d 32 (1987); Swainer v. State, 473 So.2d 180, 186 (Miss. 1985). Thomas argues that his motion to suppress should have been granted, since the evidence was illegally obtained due to the fact that there existed no probable cause for his warrantless arrest. Accordingly, we must entertain the question of whether there was probable cause to arrest Thomas without a warrant.
In Shell v. State, 554 So.2d 887 (Miss. 1989), rev'd on other grounds, 595 So.2d 1323 (1992), we upheld the admission of certain evidence and enunciated:
This Court has summed up the requirements for probable cause which would support a warrantless arrest in the following manner:
[A] police officer must have (1) reasonable cause to believe a felony has been committed; and (2) reasonable cause to believe that the person proposed to be arrested is the one who committed it.

Floyd v. State, 500 So.2d 989, 991 (Miss. 1986). See also, Lockett v. State, 517 So.2d 1317, 1327 (Miss. 1987); Rule 1.02(3), Miss. Unif.Crim.R.Cir.Ct.Prac.

*1348 Along these lines, the Court has also held that:
The existence of `probable cause' or `reasonable grounds' justifying an arrest without a warrant is determined by factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. The determination depends upon the particular evidence and circumstances of the individual case.

Lockett v. State, 517 So.2d 1317, 1327 (Miss. 1987) (quoting Swainer v. State, 473 So.2d 180, 186 [Miss. 1985]).
Shell, 554 So.2d at 896. In Gandy v. State, 438 So.2d 279 (Miss. 1983) we provided the following:
Before a warrantless yet lawful arrest could be made, it was not necessary that ... [the police] have reasonably believed beyond a reasonable doubt that .. . [the defendant] was involved in a cocaine deal .. . [The police] need only have entertained a reasonable belief that ... [the defendant] was involved  a belief rising above mere unfounded suspicion.
Gandy, 438 So.2d at 283.
By all means, when one hears over a radio scanner a dispatcher sending a patrol unit to the scene of a rape, there exists reasonable suspicion to believe a crime had been committed. In the case at hand, the information possessed by Police Chief Smith met the minimum requirements. Next, was there reasonable suspicion, amounting to more than an unfounded suspicion, to believe Thomas was involved?
Chief Smith testified that the police had been called within a few weeks prior to this rape to investigate sixteen prowler complaints and one attempted rape. It was his testimony that Thomas had been seen several times within half a city block of where each of the previous incidents occurred. Thomas had also been identified to Chief Smith by an unknown informant as the suspect running across her yard pursued by police officers after the attempted rape of a thirteen-year-old girl. Chief Smith testified at the suppression hearing that, following the attempted rape of the young girl, police officers found tennis shoe tracks leaving the immediate area where the attempt took place. A cast was made of this distinctive print, and the track print was identical to one Smith had observed at Thomas' house on the night Ms. Pearson was raped.
With these reasons to suspect Thomas might be involved in the rape, Chief Smith drove directly to Thomas' house after hearing the call from the police dispatcher and saw Thomas standing on the corner of the street. Chief Smith went to the police station and later back to Thomas' residence. Police Chief Smith's suspicions rose above mere unfounded suspicions and met the necessary requirements for probable cause to arrest Thomas without a warrant.

II. WAS THOMAS DENIED DUE PROCESS OF THE LAW AS GUARANTEED BY THE CONSTITUTION OF THE UNITED STATES AND THE CONSTITUTION OF THE STATE OF MISSISSIPPI BY A ONE DAY DELAY IN BRINGING HIM BEFORE A MAGISTRATE FOR HIS INITIAL APPEARANCE?
Thomas claims that his rights were violated by a one-day delay from the time of his arrest until he was brought before a magistrate for his initial appearance. Rule 1.02 of the Uniform Criminal Rules of Circuit Court Practice provides, in part, that "[i]n all cases of arrest without a warrant, the person making such arrest must inform the accused of the object and cause of the arrest ... and upon completion of the arrest the person or persons arrested should be taken forthwith before a magistrate." In addition, Rule 1.04 of the Uniform Criminal Rules of Circuit Court Practice provides that "[e]very arrested person shall be taken before a judicial officer without unnecessary delay." Thomas claims that the state over-stepped the boundaries of fundamental fairness by not placing him forthwith before a magistrate. This argument is without merit for a number of reasons.
First, Thomas did not raise this argument at trial or in his motion for a JNOV, and, therefore, he has waived this argument altogether. See Porter v. State, *1349 564 So.2d 31, 35 (Miss. 1990); Freeland v. State, 285 So.2d 895, 896 (Miss. 1973). Secondly, Thomas cites no authority for his contention that a one-day delay in his initial appearance constitutes reversible error. When an argument is not supported by any legal authority, this Court need not hear it on appeal. Allman v. State, 571 So.2d 244, 254 (Miss. 1990). See Kelly v. State, 463 So.2d 1070, 1072 (Miss. 1985). Thirdly, even if Thomas raised the argument at trial or in his JNOV motion, he has not shown how his constitutional rights were violated by the one-day delay.
In Veal v. State, 585 So.2d 693 (Miss. 1991), we found no prejudice existed where a magistrate was present in the police station when the defendant was, after having been arrested, brought to the station but not afforded an initial appearance. Veal, 585 So.2d at 698-99. Although there is no showing regarding the reason for the one-day delay, Thomas did not bring this to the trial court's attention, did not cite any authority for his proposition, nor did he show how it adversely affected his receiving a fair and impartial trial. This assignment of error is without merit.

III. DID THE TRIAL COURT ERR IN REFUSING A JURY INSTRUCTION DEALING WITH THE IDENTIFICATION OF THOMAS?
Thomas requested a jury instruction regarding identification testimony. The trial court refused to allow it because the only eyewitness to the crime, the victim, could not identify Thomas. Thomas insists that this instruction applies to both an identification by a witness to the perpetration of a crime and to any eyewitnesses to events which would be detrimental to the defendant and tend to support the State's theory of events.
Thomas cites United States v. Telfaire, 469 F.2d 552 (D.C. Cir.1972), and Davis v. State, 568 So.2d 277 (Miss. 1990), as his authority. However, both cases involved situations where eyewitnesses to the crime identified the defendant in court. Neither case supports Thomas' contention that an identification instruction should be given where no eyewitness to the crime identified the defendant as in the case at hand. In fact, Telfaire quotes the model jury instruction from which Thomas modeled his instruction: "Identification testimony is an expression of belief or impression by the witness. Its value depends on the opportunity the witness had to observe the offender at the time of the offense and to make a reliable identification later." Telfaire, 469 F.2d at 558. (emphasis added).
No reversible error occurred in the trial of this cause. Police Chief Smith met the minimum requirements under our law to make an arrest without a warrant. Thomas experienced no constitutional deprivation from a one-day delay from the time of his arrest until he was brought before a magistrate for his initial appearance. Lastly, the trial court was correct in refusing to allow Thomas' jury instruction regarding eyewitnesses since the only eyewitness to the crime, the victim, testified that she could not identify her assailant.
There being no error in the trial below, the conviction and sentence are affirmed.
COUNT I  CONVICTION OF BURGLARY AS AN HABITUAL OFFENDER AND SENTENCE OF FIFTEEN YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED. COUNT II  CONVICTION OF RAPE AND SENTENCE OF TWENTY YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED. SENTENCE IN COUNT II SHALL RUN CONCURRENTLY WITH SENTENCE IN COUNT I. COUNT III  CONVICTION OF RAPE AND SENTENCE OF TWENTY YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED. SENTENCE IN COUNT III SHALL RUN CONCURRENTLY WITH SENTENCES IN COUNTS I AND II. APPELLANT IS GIVEN CREDIT FOR TWO HUNDRED SIXTY TWO (262) DAYS TIME SERVED AND SHALL PAY ALL COSTS.
HAWKINS, C.J., DAN M. LEE and PRATHER, P.JJ., and BANKS, JAMES L. ROBERTS, Jr., and SMITH, JJ., concur.
BANKS, J., concurs with separate written opinion joined by SULLIVAN, J.
PITTMAN, J., not participating.
*1350 BANKS, Justice, concurring:
I concur with the result reached by the majority. I write separately because I disagree with the path to that result.

I.
With regard to probable cause for the arrest, the chief of police gave two versions of events. In the version related at the suppression hearing, he said that he returned to the scene of the crime generating the arrest and saw footprints appearing to match both those at the prior attempted rape and those at Thomas' parents' home prior to asking Thomas to go to the police station. In the version given at trial the testimony was that Thomas was brought to the police station before the similar footprints were found at the instant crime scene. This last version is that related by the majority and it is troubling if it is deemed sufficient probable cause.
What the chief of police knew is that there was a report that Thomas was identified as running near the scene of another crime, had been accused of a third crime and had been seen in "white neighborhoods." Footprints at the first crime scene were similar to ones at Thomas' parents house. Whether this information is sufficient for an arrest on the charges stemming from the first attempted rape is problematic. It should be clear that without more, it is insufficient for a warrantless arrest in the instant case. United States v. Webster, 750 F.2d 307, 314 (5th Cir.1984); Fuller v. State, 230 So.2d 213 (Miss. 1970); Beck v. Ohio, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). Compare Charles v. Smith, 894 F.2d 718, 723 (5th Cir.1990)
Shell, relied upon by the state and the majority is distinguishable. Shell had actually waived his rights on several occasions and admitted to involvement in the crime prior to the seizure of the tennis shoes there involved.
The state suggests an alternate ground for not suppressing this evidence. That is, it suggests that the evidence was not "the fruit of the poisonous tree" because it would have been discovered inevitably. Marshall v. State, 584 So.2d 437 (Miss. 1991) citing Nix v. Williams, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). It seems that the investigators had already sent for bloodhounds and that the dogs followed a scent from the scene to Thomas' house without the use of the tennis shoes. I would affirm for this reason rather than on the basis that there was probable cause for Thomas' arrest in connection with this crime.

II.
I also take issue with the position taken by the majority that eyewitness instructions need only be given where the eyewitness actually witnesses the crime. The fact is that many cases involve only circumstantial evidence where eyewitness testimony to some of the circumstances is crucial. Surely, an eye witness who places one at or near the scene when one claims to be elsewhere is crucial despite the fact that the eyewitness did not see the crime committed.
In the instant case the state suggests that because the eyewitness in question knew Thomas, no instruction was needed. That factor is likewise not amenable to a hard and fast rule precluding such an instruction. While, it might be supposed, and indeed, there may be studies to show, that one previously familiar with a person is less likely to make an erroneous identification, other factors such as the opportunity to observe, distance, light and the like, must also be considered.
Here the instruction was drawn in such a manner as to refer to one who actually witnessed the crime. It was properly rejected in the form tendered. Additionally, it is a guiding, common sense type instruction rather than one which embodies the legal gravamen of either the crime or a defense. Moreover, there was ample evidence for conviction without the testimony of this witness. Under these circumstances, I agree that there was no abuse of discretion sufficient for reversal.
SULLIVAN, J., joins this opinion.